R. WATERHOUSE *v.* R. A. BOURKE, Administrator.

Property found among that of the deceased is properly inventoried among his effects.

The true owner thereof can claim the proceeds only of sales of his property made by an administrator in good faith.

Having neglected to claim his property both before and at the time of the inventory, there was nothing to prevent the administrator from selling them according to law. If the requisitions of law, in making the sale, were not complied with, the creditors alone would have recourse against the administrator, if they suffered by his unlawful act. The owner of the property would have no right to complain, particularly when he suffered no damage thereby.

APPEAL from the Second District Court of New Orleans, *Morgan,* J. *Benjamin, Bradford & Finney,* for plaintiff and appellees    *Chilton & Harrison,* for defendant and appellant.

COLE, J.    The plaintiff, who is a citizen of Texas, deposited with the late *R. W. Powell,* of New Orleans, certain Texas " red back" bonds, or notes, for which he holds the following receipts :

" NEW ORLEANS, May 23, 1850.

" *R. Waterhouse,* left in my care a lot of Texas red back bonds, amounting to, say $3,083, nominally, which will be delivered to him or his order.

(Signed)                        R. W. POWELL."

" February 6, 1852.—Received, also, nine hundred and ninety-one of the above bonds or notes of Texas, deliverable as above.

(Signed)                        R. W. POWELL."

*Powell* died on the 18th of September, 1855, and his succession was opened in the Second District Court of New Orleans, on the 15th December, 1855, when the defendant, *R. A. Bourke,* was appointed administrator.

The inventory taken on January 30th, 1856, contains the following statement :

" Two packages of bonds of the Republic of Texas, found in the tin-case of *R. W. Powell,* delivered by *Mr. Girault,* one of which containing in notes of various denominations $991 ; and the other, containing $3,128, comprising a total sum of $4,119, which not having been presented within the time prescribed by the laws of Texas, the whole amount is without present value by limitation of those laws—*no value.*"

About the 21st of February, 1856, *R. P. McMasters,* a broker of New Orleans, applied to the defendant and offered to purchase these bonds. Defendant at first declined selling them at *private sale,* but afterwards, having conferred with his counsel, agreed to sell, and did sell and deliver them to *McMasters,* on the 21st day of February, for twenty cents on the dollar.

Previous to this sale, *Bourke* had applied to *McMasters* for information respecting the value of this script, and had been informed by him that it was prescribed and of no market value ; and *McMasters* further testifies, that it was of no market value at the time he purchased from the defendant, and that his only motive for buying it, was that he had an order from Texas to buy it, for a person who was indebted to the government as security of a defaulting officer, and could use it in paying the indebtedness. But for this fact, *McMasters* says, he would not have bought it.

It is further testified to by the counsel of defendant, that he informed *Bourke* that he could not legally sell this script, as administrator, at private sale, but that as it was worthless, and he might never again receive an offer for it, it would be

the best policy to sell it, and thereby save twenty cents in the dollar to the succession, which otherwise would be lost; and that then he could apply to the court by petition, stating the special facts, and obtain an order of sale, under which the title of *McMasters* might be legalised.

Accordingly, in April 1856, an order of sale was made, and on the 11th day of July following, the script was sold by the Sheriff.

Up to this period, no claim or demand had ever been made by *Waterhouse* upon the defendant for this script, and the only information he had received, was from *L. H. Gardner*, formerly employed by the firm of *Powell & Co.*, of which *R. W. Powell* was a member. *Gardner* was present when the tin-box containing *Mr. Powell's* private papers was opened, in order to be inventoried. There was a package of " red backs," Texas bonds, found in this tin-box. *Gardner* testified that he told *Mr. Bourke*, that whilst he was in Texas, he called upon *Mr. Waterhouse* in relation to the business of the debt he owed to *Powell & Hopkins*. *Mr. Waterhouse* produced two receipts for the " Texas red back bonds," as a proper credit on the debt, the payment of which he claimed. That he then stated to *Mr. Bourke*, he believed these bonds were the property of plaintiff, and that he believed them to be the same, the receipts of which he saw in the hands of *Mr. Waterhouse*.

It further appears, that "red backs" were redeemed in June, 1856, at 76 cents on the dollar, at Washington, but it does not appear that *Bourke* knew this fact, or that indeed it was known to any except speculators.

*McMasters* says, it was known when he bought of *Bourke*, in February, 1856, that the creditors of Texas were *supplicating* Congress to pay *all* the debts of Texas, but *McMasters* did not reveal this fact to *Bourke*.

On the 12th of May, 1857, plaintiff instituted this suit, in which he prays that *Bourke* be ordered individually, as well as in his capacity as administrator of the succession of *R. W. Powell*, to deliver said bonds deposited as aforesaid, to petitioner, or in default thereof, to pay him $4,074, their present value.

There was judgment in favor of the plaintiff against the succession of *R. W. Powell*, for $914 85, the amount paid to the administrator by *McMasters* for the bonds, which sum is to be taken out of the assets of the succession by preference and privilege over every other person. It was further decreed, that the plaintiff recover from the defendant, individually, $2,217 89, the difference between the price given by *McMasters* and the value of the bonds as proved upon the trial. Defendant has appealed.

There is a bill of exceptions to the exclusion by the court, of the testimony of *J. M. Chilton* and the cross-examination of *McMasters*.

The testimony of *Chilton* ought to have been admitted, except as to that part containing the communications of *Bourke* to him.

The cross-examination of *McMasters* was also admissible, for this as well as the testimony of *Chilton*, tend to show the good faith of *Bourke* in disposing of the bonds.

We are of opinion that *Bourke* ought only to be held liable in his administrative capacity for the amount received by him and put upon his tableau, as the proceeds of the sale of the bonds.

It is clear that he acted in perfect good faith, and even admitting that the sale to *McMasters* was illegal, still plaintiff cannot raise this objection, because he does not sue as a creditor of the estate, but claims a special deposit made with the deceased in his lifetime.

WATERHOUSE
*v.*
BOURKE.

It does not appear why this deposit was made, and it appears singular that the bonds should have been left for so many years with *Powell.*

*Gardner,* indeed, testifies that plaintiff produced to him in Texas, the two receipts for the bonds, as a proper credit on the debt, the payment of which *Gardner* claimed as due to *Powell & Hopkins.*

This testimony is not explained, and it leads to the conclusion that plaintiff considered these bonds as compensated by his debt. However this may be, there was certainly great neglect in plaintiff to permit the bonds to remain so many years with *Powell,* if the latter had no offset against them, or did not hold them as collateral security.

*Powell* is now dead, and it is impossible for his administrator to explain the cause of this long deposit, and the claims that the deceased may have had against the bonds.

The facts of this case establish that the bonds brought as much as they would, if the order of court had been first obtained for their sale.

Defendant had the right to put the bonds upon the inventory as the property of *Powell.* He found them among his papers, and the testimony of *Gardner* was not of such a nature as to authorize *Powell's* administrator to consider the bonds as the property of plaintiff.

Art. 1099 of the Civil Code, instructs the Judge or Notary, to "make mention of the effects and property which are *claimed* by third persons, as having been intrusted to the deceased to keep on deposit, consignment, or otherwise, all of which must be estimated with the effects of the succession, though they can be taken out of the inventory, *if the claim to them is established.*"

These bonds were not claimed by plaintiff; he made neither before nor at the time of the inventory any demand for them.

There was nothing then to prevent the administrator from selling them according to law. If he erred in not following in their sale the requisitions of law, the creditors of the estate may have their recourse against him, if they have suffered by his unlawful action, but plaintiff not being a creditor can only object under the circumstances of this case, and hold the administrator liable, in the event he had no right whatever to sell the bonds.

If he had the right to sell, then the neglect to follow the strict formalities of law incumbent upon administrators, cannot be complained of by him, particularly when he suffered no damage thereby. Plaintiff, with a bad grace, invokes the enforcement of the most rigid principles of law, when his own *laches* has produced the difficulties, and when the administrator acted in good faith for what he believed, under the advice of counsel, to be for the best interests of the estate.

The succession of *Powell* was opened in December, 1855; *McMasters* purchased the bonds about the 22d of February, 1856, at which time, the period for a sale of all the effects had not only arrived, but had passed, for more than a year had expired from the opening of the estate. The administrator was not bound to wait any longer to see if any one would claim the bonds.

Even supposing that plaintiff has the same rights as creditors of the estate, for recovery of damages for selling illegally these bonds, still he can recover none, for he has not suffered any. He obtained as much by the private sale, and the attempt to cure the illegality by the public sale, as if the order of court had first been obtained for their sale.

Besides, if this script, in consequence of the failure of Congress to act, had remained of no value, the defendant could not have withheld from plaintiff what he

received for it. It would seem, then, that if he could not be benefited by the continued want of value of these bonds, that he should not suffer by their accidental increase of value. C. C. 2291 ; 7 An. 487 ; 12 La. 124 ; C. C. 2489 ; 5 An. 550 ; 3 An. 381 ; 2 La. 69 ; C. C. 2427 ; 17 La. 281 ; 6 La. 452 ; C. C. 1140.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be amended as follows, to wit : that that part of the judgment which decrees that plaintiff shall recover judgment against the defendant *Bourke,* individually, for $2,217 89, be avoided and reversed ; and that there be judgment in *Bourke's* favor against the individual demand against him, and that the judgment so amended be affirmed, and that plaintiff pay the costs of appeal.

MERRICK, C. J. I concur in this case on the ground that the rule of damages was the market value of the bonds when sold by the administrator, in February, 1856. It does not appear that their market value at that time exceeded the price received by the administrator.